In the Matter of the Accounting of RICHARD RODGERS, as Temporary Administrator and Executor of the Estate of LORENZ HART, et al., Deceased.

Surrogate's Court, New York County, October 27, 1948.

*Howard E. Reinheimer* and *Arthur J. O'Leary* for temporary administrator and executor and another, petitioners.

*Harrison Tweed, Samuel R. Ballin* and *Florence Brush* for Theodore Hart and another, respondents.

*Emil Goldmark, Alfred Rathheim, Harold M. Hoffman* and *David L. Schreiber* for Federation of Jewish Philanthropies of New York, respondents.

*Lester R. Bachner* for Wini Kron, and as special guardian for Wini Kron and others, infants, respondents.

DELEHANTY, S. Deceased was a notably successful writer of lyrics who with Richard Rodgers, an equally successful composer, created a great number of individual musical compositions and wrote the '' books '' and music of many successful musical productions. Singly or together they copyrighted their works. They were members of the Society of Composers, Authors and Publishers (commonly called ASCAP) and pursuant to the rules of that society made various assignments to it. They had other contractual relations with various music publishers and with producers of motion pictures. Royalties and other income reached the collaborators out of these assignments and contracts.

Since deceased's death his executors have received like remittances representing the interests of deceased in such compositions. The account now before the court allocates to principal 10% and to income 90% of the remittances from ASCAP. The account allocates 15% to principal and 85% to income of the receipts from music publishers and other sources. The parties interested in the estate have approved these allocations. The data furnished to the court warrants the distinction drawn between the funds. The court approves the allocations now made and adjudges that like allocations should be made in the future in respect of funds of the same sort received after the closing date of the period to be settled by the decree entered hereafter.

These rulings leave for consideration one matter in respect of which the parties are in conflict. The point in issue is the

allocation either to principal wholly or to income wholly or to both, in some degree to be determined by the court, of sums already received and sums still to be paid under a contract made with a motion-picture producing company by the executors of deceased, by Mr. Rodgers and by various other persons. This contract envisaged the production of a motion picture based upon the lives and the compositions of " Rodgers and Hart ", as the collaborators were publicly known. The executors of deceased undertook to convey to the motion-picture company such rights as the estate had in all of the compositions of deceased and undertook to give leave to have an actor represent him as a living person in the production. The consideration to be received by the estate under the contract has been paid in part. Additional portions of the consideration are still to be received over a period of years. So much of the consideration as was received prior to the closing date of the account now on file has been reported in the account and has been allocated tentatively by the executors 15% to principal and 85% to income. This allocation is attacked by all parties affected. The charitable remainderman of the trust for the brother of deceased asserts that the entire fund is produced by the sale of a capital asset, that the proceeds constitute principal solely and that there is no basis for apportioning any part of it to income. If this primary contention is held unsound this remainderman asserts that a formula for apportioning the contract proceeds should be adopted which would transfer to capital account a much larger fraction than is proposed by the executors. The income beneficiaries assert that no part of the proceeds of the contract belongs in principal account. They say that no capital asset was involved in the transaction and that the contract constituted a mere licensing of deceased's musical property rights — the capital value of which has already been or will be recouped. The brother of deceased says in any case that under the will of deceased these proceeds, whether principal or income, are payable to him in due proportion because of the tenor of deceased's will. These contentions pose the problem for solution. The executors have stated the facts and have submitted the matter for court decision — taking no position themselves on the rights of the parties.

Primary consideration must be given to the contention of deceased's brother that at least so far as he is concerned the terms of the will entitle him to his share of the proceeds of the deal with the motion-picture producers. Inspection of the will discloses that in the fifth paragraph the residue of the estate after outright gifts to others was put in trust in the proportions

of 70% and 30%. The 70% trust is stated in the sixth paragraph to be for the primary benefit of the brother. The trust scheme provides that the brother gets the whole income of this share so long as he lives (except as hereafter noted) and that his wife gets it if she survives her husband. The remainder is directed paid to a charity after the death of both the brother and his wife. However there is a provision in the will to the effect that if the brother seeks to anticipate any of the income or if he becomes involved financially so that creditors might attempt to get any part of it, all interest of the brother in the income will thereupon terminate. Thenceforth the trust is limited on the life of the wife of the brother and the principal on her death goes to the charity. In support of the contention that there was special consideration intended by deceased for his brother a considerable body of background fact about the family of deceased and the latter's relations with his brother was taken. On the basis of the proof so taken and the provisions of the fifth and sixth paragraphs of the will the brother relies for his contention that the moneys in issue must — at least to the extent of his share — be paid over to him.

In opposition to this contention it is pointed out that the references to " the entire income, interest, rents and profits '' in the brother's trust — text relied on to show special concern for the brother — are repeated in the disposition of the income of the 30% trust for a person who was a stranger in blood to deceased. In addition it is pointed out that in the case of the 30% trust the income beneficiary's life alone measures the trust and that the issue of such beneficiary are given the principal, while in the case of the brother his issue have no interest in principal. As already noted it is entirely possible that the brother might lose all interest in the income if, while his wife lives, his financial difficulties result in the creation of a basis for eliminating him. Once the brother is eliminated the trust is limited on the life of the brother's wife and if she then should die while her husband continued to live he would be wholly without interest in the trust. The total disregard of any issue of the brother perhaps means that deceased never envisaged the birth of such issue. It may be, too, that deceased hoped that the terms of the will which might leave his brother under certain circumstances without any income interest in the trust would never be operative. But the fact remains that the provisions for the brother not only do not show any special consideration for him nor show any intent to distribute capital assets to him but on the contrary so circumscribe his rights as to negate the argument

based on the family relations and the tenor of the will. It follows that the court must consider the questions at issue without regard to the arguments based on a construction of the will; and must deal with the interest of the beneficiary of the 30% trust on precisely the same basis as it deals with the interest of the brother in the 70% trust.

Before leaving the question of construction brief notice must be taken of some tenders of proof designed to show oral declarations of deceased dehors the will respecting his understanding of the meaning of his will and respecting his understanding of the extent of the benefits conferred or to be conferred by him on his brother both by the will and otherwise. These declarations were all excluded since there is here no equivocation or latent ambiguity in the will (*Matter of Lummis,* 101 Misc. 258, 266; 9 Wigmore on Evidence [3rd ed.], §§ 2471–2472; Thayer, A Preliminary Treatise on Evidence at the Common Law [1898 ed.], p. 482).

The court turns now to the question of allocation. The remainderman of the brother's trust says that no substantial right remained in the composers after they assigned their copyrights. It emphasizes that what has been sold is chiefly a right of privacy plus a permit to have deceased represented by an actor and that hence the proceeds of such sale must be dealt with wholly as principal. Concededly there is no common-law right of privacy. Concededly there is no statutory right of privacy enforcible by an estate representative in the State of New York in respect of a dead man. However, the argument proceeds on the basis that in other States of the Union and possibly in other places where the motion picture could be exhibited there might be difficulty in presenting the picture without having first assured against attack by the estate. From the premise thus stated the conclusion is drawn by the remainderman that the thing sold was a capital asset and nothing else.

The court does not agree with this viewpoint. While in some measure the considerations thus urged may have dictated the contract and may be represented in a degree in the sum contracted to be paid, it is the court's view that the major consideration involved was the acquisition by the motion-picture producing company of what are called in the record " grand rights " or " cavalcade " rights. It is sufficiently shown that the trade recognizes that the rights so labeled still remain in the composers of lyrics and music despite assignments by them of copyrights to individual pieces. While the assignee of such a copyright has interests in the individual composition assigned which

must be respected there still remains in the original composer a residual right to forbid or to control the combined use of his compositions such as the motion-picture producing company desired here to exercise. Such combined use might involve the selection of a mere snatch from one composition, the use of the whole of another and a combined use of still others. The freedom of choice respecting the use of the whole or any part of any in the whole list of compositions was not procurable, according to the testimony, even by a combination of assignments or by agreements made with all the assignees of the copyrights. There still was needed the assent to the over-all use just described before the motion-picture producer could be assured against attack if he removed portions of the compositions from their original settings and used them as the demands of the story and of the picture might dictate. Conceiving the thing sold by the estate to be a grant of this reserved " grand right " or " cavalcade " right as well as a guarantee against any estate attempt to enforce any right of privacy granted under any statute or body of case law in any jurisdiction the court reaches the conclusion that the proceeds of sale must be apportioned.

The standard of apportionment requires consideration of various factors. There is here a single payment which completely exhausts the estate rights, so far as it has any, either in the privacy of deceased or in such reservations as still continued in him in respect of his compositions. These considerations tend toward emphasis on capital account. On the other hand all but a small fraction of the population of the United States (and hence of possible patrons of motion-picture houses) reside in areas where there is no right of privacy either at common law or by statute which would enure to the estate of a deceased person. Moreover the proof is that the right of reproduction of the words and music is the major element in the making of the picture, with the story of the lives of the composers used merely as a framework upon which to exhibit their compositions. Any desire of patrons of motion-picture theatres to know more of the private lives of the composers is clearly subordinate to the anticipation of pleasure in listening to well-known music and well-known lyrics of another day presented as this contract envisages. This emphasizes the fact that the transaction chiefly derived from the desire to reproduce the words and music.

Note should be taken of the testimony that the production and showing of a motion picture in which the compositions of Rodgers and Hart will be made known to a wider audience than they have hitherto enjoyed will result in larger sales of sheet

music and of phonograph records and in a larger use by musicians of the music and the words and in a larger use of the compositions in radio performances and in television shows. Such revived and additional uses will produce for income account larger returns of royalties in the categories already mentioned in the first part of this decision. Thus income account derives a benefit apart from any share in the contract payments.

In the sequel the court must evaluate these factors just as a jury would and must render such verdict (Surrogate's Ct. Act, § 71) as it deems just to both sides. That verdict is that principal account should have 25% of the contract proceeds and income account the remaining 75%.

The proposed allocation of estate taxes is not objected to by any party affected thereby. It seems to be in accordance with the statute and is approved.

The account of the executors should now be brought down to date by supplemental affidavit and distribution made so far as is possible. When the supplemental data are in hand a decree may be submitted, on notice, settling the account of the temporary administrator and settling the account of the executors in accordance with the rulings here made.